UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
ANA FELIPE,                                   :
                                              :
                           Plaintiff,         :
                                              :    **ORDER GRANTING**
           -against-                          :    **DEFENDANTS' MOTION**
                                              :    **FOR JUDGMENT ON THE**
MICHAEL J. ASTRUE,                            :    **PLEADINGS**
Commissioner of Social Security,              :
                                              :    07 Civ. 7091 (AKH)
                           Defendant.         :
-------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

　　　　The Plaintiff, Ana Felipe, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security ("the Commissioner") that Plaintiff was not disabled for the period of October 28, 1998 through October 13, 2001. Plaintiff alleges that she was disabled as of November 1, 1999. The Commissioner and Administrative Law Judge ruled that Plaintiff was disabled as of October 13, 2001. Plaintiff filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. Rule 12(c) on March 7, 2008, and the Commissioner cross-moved for judgment on the pleadings on May 13, 2008.

　　　　For the reasons stated below, I hold that the Commissioner's decision was supported by substantial evidence. Accordingly, I grant the Commissioner's motion, and deny plaintiff's motion, for judgment on the pleadings.

**Background**

　　　　Ana Felipe was born on September 6, 1952. She has a Bachelor's of Science degree and a Master's degree from John Jay College for Criminal Justice. From 1982 to 1998, she worked as a probation or parole officer and earned an average income of more than $50,000

1

per year. She also worked a second job as a youth counselor for the Jewish Board of Children's Services.

Plaintiff first experienced vertigo in October of 1998.[1] She went to the hospital after the initial onset of symptoms and was diagnosed with vertigo and advised to take several weeks leave from work. Plaintiff stayed home for one week, and then returned to work. However, when she returned to work, the vertigo attacks began again, and plaintiff was out of work for nine months. She then returned to work from mid-September to mid-November 1999, but the vertigo attacks again became unbearable, and plaintiff again had to leave work, this time for over a year. She returned to work for the final time in December of 2000. She was able to work for three days, but again was unable to work due to the vertigo, and left in December of 2000. She has not returned to work since that time. During this time, plaintiff received monthly long-term disability checks from Hartford Insurance Company.

At her hearing before Administrative Law Judge ("ALJ") James B. Reap, petitioner testified that she is able to read for short periods of time, prepare meals for herself three times per week, drive to doctors' visits, take public transportation, shop for basic needs in local stores, and attend church regularly. Plaintiff testified that the vertigo caused her to misjudge distances, fall and bump into walls and other people, and caused her to sustain injuries.

**Procedural History**

Petitioner first filed an application for Social Security Disability Benefits ("disability benefits") on July 20, 1999, claiming that she has been disabled since October 28, 1998. This claim was denied in November 1999 and plaintiff did not appeal. Plaintiff then filed

---

[1] Vertigo is "[a] sensation of spinning or whirling motion. Vertigo implies a definite sensation of rotation of the subject (subjective vertigo) or of objects about the subject (objective vertigo) in any plane." See WebMD, Steadman's Medical Dictionary, available at http://dictionary.webmd.com/terms/vertigo (last visited August 5, 2008).

another application for disability benefits in February of 2002, claiming a disability onset date of November 1, 1999. This claim was rejected on May 13, 2002, and plaintiff then requested a hearing before an Administrative Law Judge. ALJ Reap presided over a hearing on October 28, 2003 and January 27, 2004. He found that plaintiff was disabled as of October 13, 2001, the date when she had emergency back surgery on grounds that "there has not been a significant number of unskilled sedentary jobs in the national economy that claimant can perform." Tr. 8-9. He rejected her disability claim for the period prior to that date, finding that "few occupations in the unskilled sedentary occupational base require work in environments with such unusual hazards, a finding of "not disabled" is appropriate within the framework of Rule 201.01. Id.

Plaintiff seeks review by this court pursuant to 42 U.S.C. § 405(g), alleging that ALJ Reap committed legal error in failing to give proper weight to the opinion of plaintiff's treating physician, and, alternatively, that ALJ Reap violated the Social Security Act by failing to make detailed findings supported by specific citations to record evidence in his credibility findings.

**Medical Evidence**

Physician Geoffrey Pollack, an otolaryngologist, treated plaintiff from the onset of her symptoms in October 1998, and during the period at issue. On October 26, 1998, he diagnosed her with vertigo, and began treating her with Antivert and vestibular rehabilitation. Dr. Pollack's notes indicate that she woke up with dizziness three days prior to her appointment. On November 12, plaintiff reported that she was doing better and had returned to work, but that the vertigo was recurring. Tr. 190-191, 400-401.

On November 21, 1998, plaintiff had a magnetic resonance imaging (MRI) scan of the brain and internal auditory canals (IAC). The impression was "grossly unremarkable

3

contrast-enhanced MRI of the brain with attention to the IAC region." Id. at 403. In December 1998, plaintiff reported to Dr. Pollack that she had no symptoms while being off her medication and intended to return to work. Id. at 191. Later in December, she told Dr. Pollack that the vertigo had returned and she resumed taking the Antivert on December 13, 1998. Id.

On March 3, 1999, Dr. Steven J. Saunders, Ph.D., a licensed audiologist, conducted an electronystagmography (ENG) test to evaluate plaintiff's symptoms of dizziness and vertigo. Id. at 200-01. He found significant nystagamus[2] in the right-lateral position only, and noted that the patient refused the last three of the four bithermal caloric tests,[3] although she did state that her "subjective response" to the first test was similar to her own vertigo attacks. Tr. at 129. Dr. Saunders stated that he could not provide a medical opinion as to plaintiff's ability to work at that time.

During 1999, plaintiff had six appointments with Dr. Pollack, five of them following her tests with Dr. Saunders. At the first appointment, on March 10, 1999, Dr. Pollack reviewed the results of her tests with her. She then saw Dr. Pollack again on June 14, and reported that the vestibular rehabilitation treatment was helping her condition. On June 28, she stated that her symptoms had returned. On August 19, she said she was doing better and going back to work. Finally, on November 24, plaintiff informed Dr. Pollack that she had been doing well until she contracted a cold a week before and her vertigo symptoms had returned. Dr. Pollack prescribed Antivert and told plaintiff to obtain vestibular testing. Between December 16, 1999 and January 11, 2000, plaintiff received physical therapy and reported some improvement

---

[2] Nystagmus is defined as a "periodic rhythmic ocular oscillation of the eyes" that is commonly characterized by a "slow initiating phase and a fast corrective phase." Christopher Bardof, Nystagmus, Acquired, at http://www.emedicine.com/oph/topic339.htm (last visited August 29, 2008).
[3] A caloric test, also known as Barany's caloric test is a procedure designed to evaluate the condition of the labyrinth (the inner ear). "In the normal individual, irrigation of the ear ... with hot ... or cold ... water produces nystagmus ... but when the labyrinth or vestibular nerve is not functioning, there is no nystagmus." *See* 1 Attorney's Dictionary of Medicine at B-27 (defining Barany's caloric test); 1 id. at C-22 (defining caloric test).

in her symptoms. However, she failed to continue her physical therapy and was discharged on January 27, 2000. Tr. 412-413.

During 2000, plaintiff saw Dr. Pollack three times. On January 10, she reported that she was doing better with her exercises. Tr. 193. She returned to see him on May 15, where she complained of worsening dizziness. On December 4, she reported improvement during the three months prior to that appointment.

About a month later, on January 3, 2001, Dr. Pollack observed that plaintiff was suffering from questionable vertibular migraines. At Dr. Pollack's request, plaintiff was examined by Dr. Jeffrey Cohen, a neurologist, on March 9, 2001. She reported that she was taking Antivert "intermittently." She also told Dr. Cohen that she had been prescribed vestibular rehabilitation, but was not consistently going to sessions. After an examination, Dr. Cohen diagnosed plaintiff with peripheral vertigo. He advised plaintiff to switch her medication from Antivert to Xanax. On May 21, he noted that plaintiff's dizziness had markedly improved, compared to the previous month. On June 18, plaintiff reported intermittent dizziness. Dr. Cohen's prognosis for the vertigo was that it would be a chronic, intermittent condition. He recommended that she return to vestibular rehabilitation. He also completed a report on her condition at that time. Among other things, the report stated that she should resume vestibular rehabilitation therapy, continue taking Antivert, and recommended bed rest. He noted that in evaluating plaintiff's ability to perform activities such as sitting, standing and walking, he stated that these activities were "limited during an acute vertigo attack." Tr. 418.

The next day, June 19, 2001, at Dr. Pollack's request, plaintiff had an appointment with Dr. Tarek Mardam-Bey, an orthopedic surgeon. After examination, Dr. Mardam-Bey diagnosed back strain and told plaintiff to apply heat and use ibuprofen for two

5

weeks. There are no other notes in the medical record until October 10, 2001, when plaintiff was admitted to St. Joseph's for severe back pain and urinary urgency. She was diagnosed with cauda equina syndrome (a condition affecting certain nerve roots attached to the spinal cord) and two days later, on October 13, Dr. David Frazier performed a microdiscectomy to treat plaintiff's herniated lumbar disc and her cauda equina syndrome. Since the Commissioner found plaintiff to be disabled after the October 13, 2001 surgery date, a chronology of her illness after that date is not relevant and will not be reviewed in detail in this Opinion.

**Standard of Review**

An individual may request judicial review by the District Court in the judicial district in which he or she resides of a final decision by the Commissioner of Social Security. 42 U.S.C. § 405(g). The district court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. The Social Security Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Id. The court does not engage in a de novo determination of whether or not the claimant is disabled, Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner. See 42 U.S.C. § 405(g); see also Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004). If the Court finds there is substantial evidence for the determination, the Commissioner's decision must be upheld, even if there is substantial evidence for the Plaintiff's position as well. See Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 7982). Evidence supporting a decision is "substantial" where reasonable minds might accept the evidence as adequate. Pollard, 377 F.3d at 188 (citing Richardson v. Perales, 402 U.S. 389, 407 (1971)). The substantial evidence test applies not only to findings of

6

basic evidentiary facts, but also to inferences and conclusions drawn from such facts. Rodriguez v. Califano, 431 F.Supp. 421, 423 (S.D.N.Y. 1977).

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medially determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §423 (d)(1)(A). A claimant is disabled under the act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. § 423 (d)(2)(A).

The Social Security Administration has promulgated a five-step procedure for evaluating disability claims. See 42 U.S.C. § 423 (d)(4)(A) (ordering Commissioner to promulgate regulations prescribing the criteria for determining disability); 20 C.F.R. § 404.1520. The Second Circuit Court of Appeals has interpreted this five-step procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa, 168 F.3d at 77.

The burden rests on the claimant through the first four steps. The claimant must prove that she is unable to perform prior work activity. Once claimant proves that her severe impairment prevents her from performing her past work, the burden shifts to the Commissioner at the fifth stage of the analysis. Using the residual functional capacity assessment performed at step four, the Social Security Administration must establish at the fifth step that the claimant can perform alternative substantial, gainful work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(e); Snipe v. Barnhart, No. 05 Civ. 10472, 2006 WL 2390277, at *9 (S.D.N.Y. Aug. 21, 2006) ("The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work, and . . . at step five to determine whether the claimant can do any work.")

A Rule 12(c) motion may be granted "where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988) (citations omitted). Plaintiff alleges that the ALJ's decision is not supported by substantial evidence and was committed in error. Plaintiff alleges that the ALJ erred in failing to give proper weight the opinion of plaintiff's treating physician and failed to make detailed findings in respect to his credibility findings.

**ALJ Reap's Findings & Discussion**

ALJ Reap issued his decision on February 24, 2004, after a hearing was held on October 28, 2003 and January 27, 2004. Plaintiff testified at the hearing with her attorney present. In his decision, ALJ Reap properly considered the five steps described by the Second Circuit in Rosa. At the first step, the ALJ found that plaintiff had not performed substantial gainful work activity since November 1, 1999. At the second step, ALJ Reap found that plaintiff

8

had a severe back impairment and severe vertigo under the Act. However, proceeding to the third step, ALJ Reap found that her impairments were not so severe as to meet or equal the Listings of Impairments. See 20 C.F.R. Part 404, Subpart P, Appendix 1. He held that "[a]t all relevant times prior to October 13, 2001, the claimant had the residual functional capacity to do the full range of sedentary work 'but for' her vertigo symptoms, which precluded her from working where she would be exposed to hazards such as climbing unprotected heights . . . or dangerous moving machinery." Because the ALJ found that plaintiff was not suffering from a per se disability under the Listings, he went on to analyze the fourth step; that is, whether plaintiff's impairments precluded performance of her past relevant work. He found that plaintiff was unable to perform her past relevant work as a parole officer. At the fifth and final step, which requires the Commissioner to prove that there are other jobs that exist in significant numbers in the national economy that plaintiff can work at, ALJ Reap found that there were, in fact, "numerous unskilled jobs" . . . that existed throughout the national economy at the various 'strength' levels," including 200 sedentary occupations and 1,400 light occupations. Tr. 23. ALJ Reap took note of the fact that although plaintiff could no longer do her "past relevant work" as a parole officer, only a "few occupations in the unskilled sedentary occupational base require work in environments with such unusual hazards" that would present risks to plaintiff given her vertigo condition at that time. After taking into consideration the vocational factors of age, education, and work experience with plaintiff's residual functional capacity, ALJ Reap concluded that a finding of "not disabled" was appropriate for the period between November 1, 1999 and October 13, 2001.

       In her motion, plaintiff argues that the Commissioner's finding was flawed on two grounds: First, that the ALJ did not grant the proper weight to the opinion of Dr. Pollack, the

9

treating physician; and second, that the ALJ failed to make adequate findings as to the credibility of plaintiff's testimony. Each of these arguments is addressed in turn.

### ALJ Reap's Findings are Supported by the Objective Medical Evidence & Plaintiff's Subjective Complaints of Pain Were Afforded the Appropriate Weight

ALJ Reap's finding of plaintiff's disability, as of October 13, 2001, was based in part on the opinion of Dr. Frazier, who examined plaintiff on November 11, 2002 and reported that she was temporarily limited, from that date to September 26, 2002, in that she could not lift/carry/push or pull more than 20 pounds or sit, stand or walk more than 1 hour at a time with minimal reaching overhead and no twisting; she was not limited in keyboard use/repetitive hand motion. Dr. Frazier did not opine on how long these limitations might last.

Although a physician's disability opinion is a medical opinion binding on the Commissioner, it must be given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Thompson v. Barnhart, 75 Fed. Appx. 842, 845 (2d Cir. 2003); see also 20 C.F.R. § 416.927(d)(2)(2001). Here, ALJ Reap correctly found that Dr. Pollack's earliest opinion on plaintiff's condition, dated June 18, 2001, reported to plaintiff's insurance company that plaintiff was "limited during acute vertigo attack." The report did not identify precisely how plaintiff's abilities were limited during such an attack (i.e., whether she was able to sit, walk, stand, lift, carry, push or pull), or the nature, frequency and intensity of the attack. It was only later, in 2003, that Dr. Pollack opined that plaintiff was not able to perform activities such as standing, walking, lifting and carrying, and generally unable to function due to her severe vertigo and imbalance. Indeed, the objective medical evidence available to the ALJ suggests that before October 13, 2001, plaintiff would, in fact, have been able to perform light

10

jobs or sedentary work where she was not exposed to heights or dangerous moving machinery. Plaintiff's intermittent visits to Dr. Pollack, her discontinuation of vestibular rehabiltation (against the advice of her physicians, including Dr. Cohen, who noted that she might benefit by resuming therapy), infrequent use of her prescribed medication, and documented reports that her symptoms would occasionally improve all support the ALJ's finding. In addition, the battery of physical tests performed on plaintiff, none of which indicated the presence of a constant disability, reinforce this finding. The 1998 MRI of plaintiff's brain and auditory canals was "grossly unremarkable." Tr. 198-99. The ENG test showed normal ocular-motor tasks, with significant nystagamus in only one position, after plaintiff refused to complete the test. Dr. Cohen's examination in March 2001 revealed mild findings on the ENG and normal brain studies. He also instructed her to return in one month if she developed problems, and there is no evidence in the record showing that she returned. Finally, plaintiff's visit to Dr. Mardam-Bey in June 2001, revealed that she had no muscle weakness of radiating pain, and Dr. Mardam-Bey diagnosed her with only back strain, to be treated with heat packs and ibuprofen. In addition, when plaintiff saw Dr. Halle in 2002, she reported that her June 2001 back pain had been resolved with the treatment suggested. The reports from physicians who treated plaintiff after the October 13, 2001 date, and specifically after her January 2002 car accident (after which plaintiff admitted her symptoms noticeably worsened), are all consistent with this finding as well. Tr. 209-12, 316-318.

   The responsibility for determining a residual functional capacity rests with the ALJ, and as ALJ Reap noted, while the treating physician's opinion is to be accorded the appropriate weight, the task of rendering legal conclusions is solely within the Commissioner's purview. The ALJ has the discretion to weigh all opinion evidence, including inconsistent

evidence, and to render a disability determination based on the totality of the evidence of record. 20 C.F.R. § 404.1527(c); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). Accordingly, I hold that the ALJ's ruling was supported by the objective medical evidence.

Plaintiff's argument that her subjective complaints of pain were not given sufficient weight by the ALJ also fails. It is within the Commissioner's discretion to give subjective complaints of pain less weight relative to the objective medical evidence. Sarjeant v. Chater, 165 F.3d 14 (2d Cir. 1998) (internal citations omitted); see also Riordan v. Barnhart, No. 06 Civ 4773 (AKH), 2007 WL 1406649, at *6 (S.D.N.Y. May 8, 2007) (holding that the ALJ was not required to take plaintiff's subjective, conclusory, and unsupported anecdotal claims regarding disabling pain at face value, and that ALJ properly made an independent judgment that plaintiff's claims lacked credibility and were not supported by the record). The ALJ took note of the fact that plaintiff, despite her complaints of ongoing, severe dizziness, continued to drive even after her October 2001 surgery and January 2002 car accident. The ALJ reasonably held that such behavior was inconsistent with complaints of severe dizziness. Plaintiff also argues that her subjective complaints should be given greater weight because of her long and reliable work history, and attempts to return to her job as a parole officer. However, the ALJ considered this very fact in his decision, but appropriately found that prior to October 13, 2001, "the medical signs and findings suggest that the intensity, persistence and functionally limiting effects of her symptoms only minimally affected her ability to engage in substantial gainful activity at the sedentary level." To that extent, ALJ Reap correctly found that claimant's subjective complaints for the period before October 13, 2001 were not corroborated by the objective medical evidence, were inconsistent with the record and therefore not given substantial weight.

12

**Conclusion**

Based on my review of the proceedings below as well as a review of the objective medical evidence, I hold that the Commissioner's finding that plaintiff was not disabled during the period of October 28, 1998 through October 13, 2001 resulted from a proper application of the law and that it is supported by substantial evidence. Accordingly, I grant the Commissioner's motion for judgment on the pleadings, and dismiss the Complaint. The Clerk of the Court shall terminate the motions (Docs. # 10, 13) and shall mark the case closed.

SO ORDERED.

Dated: New York, New York
September 4, 2008

_____
ALVIN K. HELLERSTEIN
United States District Judge